et al., 222667. Just a minute, I'm having a little trouble hearing you, so why don't you angle that microphone up towards you a little bit, and I think so, just keep your voice up and we'll let you know if we have trouble hearing you, but you have 10 minutes and we'll hear from you now. Thank you. Okay. Your Honors, I'm Olena Militinska-Lake, a per se filer, and respectively present here as a defense of my human and constitutional rights as other legal protections raised in this case influenced by matters of some political and national security importance, as well as United States domestic problems. To thoughtfully decide on this case, we need to consider three major aspects, the beginning of the case, the culmination, and the filing procedures during the COVID. So the case started when my, I refer to myself as I, the case started when my colleague Jerry Shang said something very inappropriate, I'm a little bit of phrasing, so acknowledging that I'm Ukrainian, he said that he likes what Russia did to Ukraine. It was in 2014, he means annexation of Crimea, because China supports Putin. That was shocking because it was, the person was many years already naturalized, and he was, went through the naturalization process and gave his naturalization oath to endure all allegiance and fidelity to foreign sovereignty. So it, this was the first time when I raised my voice because many people were predicted what is happening now, the war in Ukraine and multiple smoldering conflict around the globe, which are fueled by Kremlin and on the ground by Beijing. So, and for me as a citizen, this phrase is, is a barrier of the same, rooted in the same field as Hamas supporters wave of protest and support of Hamas terroristic event in Israel, because the importance of naturalization oath was, was not taken seriously, specifically in this case. So this is, this is presents also a national security danger, because the person is in charge of a critical utility, so he knows all the, a lot of insider information. So that is why I reminded to management the link of naturalization oath to, to the significance of this oath to naturalization and naturalization as having citizenship as a matter of his employment. So everything was reversed against me. So I was named as his discriminator. And this was a trap, which we need to consider properly too, because the district court was not able clearly to understand this matter. So after that, I felt that a really wave of campaign against me started developing. There was multiple events, including attempt of elimination me, termination me via psychological evaluation with employee health services and discrimination with the multiple facts. One is significant to when my innovative model was rejected and the model, which was developed much later and we coordinated, it was acknowledged that my model was first. That model was accepted and presented by Jerry Sheng and it was met for his further promotion. So this, this individual is continuing his promotions to higher level. So the second event was his second attack in 2018 with sexually abusive language, which against was reversed. It's okay if you need a minute. It's okay. So this, this, so the first event was treated, was addressed improperly by department. It was not only discrimination on national origin grounds. It was also a violation of due process, which is explained in employee's book. And it was also my first attempt of first amendment violation of my first amendment protection. The second one was again, the, the violation of due process with somehow repression against me, suppression of me, culminated with my suspension and further promotion of Mr. Sheng. The district court failed to, again, thoughtfully decide on this. Besides mixing the dates of final decision, May 16, they used March 16, which kicked off my defamation claim of the statutory limitation. So, and also I need to stress that, that 300 days include my suffering. We are via the suspension without pay with supporting my mom and with danger to my house, which survives already one life threatening condition under stress. So it was, it was during this interrogation, I raised my concern and my complain a little bit allegoristic way. I don't want to repeat this phrase, but the word, the phrase which I used, it was, I heard something like this on national TV. And to consider this, the, the aspect of my raising in different, my, my person raised in different country, Ukraine, which never had any racial problem, which treated the rare representatives of African race as VIP person since historical Tsar Peter the Great time up to, through Soviet Union, when that was used as a propaganda against America, treating, treating that way, the, the, some representatives of that race. So I did not, that, that was my expression of management dissatisfaction was management treatment towards me. So that if properly and thoughtfully addressed by management, it should be just a question, why you say that and addressing it as my complaint against what is going on. Unfortunately, it was treated oppositely and district court was not able to recognize this. Um, for, uh, for me as the person raised in different country, uh, the, the, the word is N-E-G-R, which is very sound, very close to N word here. If sound, if say it quickly and, um, for, for me, the word black, white, coloring people, people of color is very segregated and racial. So I have different approach and different, um, uh, understanding of this. And, um, we need to consider also, um, that, uh, linguistic psychology. Nelson Mandela once say that if you talk to a man in a language, he understand it goes to his heart. If you talk to him in a language, um, in his language, it goes to his heart. That means, uh, say, uh, linguistic psychology explained this as person raised, formed his initial picture of the world, his, um, emotional picture of the world in his childhood with mother's tongue and that environment. For me, the word N-E-G-R will never be bad word. It was, it will be every time polite. Will it be you, even though I will never be using it here when black, white people of color are, um, Okay, ma'am, you're over your time. So if you can, um, wrap up, um, give us your conclusion, 30 second conclusion. So, um, the 300 days, uh, should be included in the, um, term. And so practically, I think this explains, uh, many, um, points of, uh, misunderstanding and the case should be reversed. Thank you. Thank you, ma'am. We'll hear from Mr. Spadola. Thank you, Your Honor. I'm just going to try to move this. What is this? There we are. May it please the court, um, much of Ms. Millitinska-Lake's complaint focuses on comments made by her coworker, Mr. Shang. Um, there were effectively two comments, one in March of 2014 and another in October of 2018. Neither of those comments can give rise to Title VII liability on the agency's part because in both instances, they took corrective action. They counseled Mr. Shang for his comments. And after the second comment, they actually separated the workstation of the two employees because there had been tensions between them. Um, in particular, Ms. Millitinska-Lake had been complaining that Mr. Shang was using a foreign language for business calls, even though the agency had told her that it was perfectly appropriate for him to speak in a foreign language. She had also been questioning his citizenship, the validity of his citizenship, as she did here today, because he professed, um, you know, political views supportive of China, according to her. And the agency reminded her that it can be considered national origin discrimination to complain about a coworker because they're using a foreign language or because they're expressing political views that, that you don't agree with. Um, with respect to the, um, suspension that she received in 2018, she used a racist comment during a meeting with a supervisor and an HR official. She claims that it was a Russian, a Russian word that she was using, but she acknowledges that it sounds identically to a very derogatory racist term in English. And the DPS officials understood the term to be racist and brought a disciplinary charge against her. It was ultimately upheld in arbitration. And the, there's nothing to suggest that the suspension of Ms. Millitinska-Lake with respect to that comment had anything to do with her national origin or her use of a foreign language. It was based on the fact that she had compared herself to a black person enslaved on a plantation, her, compared her treatment at the agency to an enslaved person and used a racist term. And that was a perfectly legitimate basis for suspending her. With respect to her due process claim, the district court correctly held that she did not allege that she was deprived of a property interest protected under the 14th Amendment. Her claim focused on her failure to receive promotional opportunities, but the law is well settled that a public employee does not have an expectation or entitlement to receive a promotion and therefore doesn't have a property interest, a vested property interest in a promotion. So that can't give rise to a due process claim. And to the extent her due process claim focuses on her suspension, she acknowledges in her suspension was conducted in accordance with the terms of her collective bargaining agreement, which sets out a very robust process for disciplinary actions, including the right to counsel, which she received during the arbitration proceeding related to that disciplinary action. Can I ask a question about the argument that you make regarding the adverse employment action that was taken? You argue that the decision by the third party arbitrator would qualify as an adverse employment decision, even if it's imputed to the DPS, because it didn't result in materially adverse change in the terms and conditions of her employment. That's at page 39 to 40. But wasn't she not only docked five days of pay, but as I understand it, she wasn't paid for the time she was suspended and then only later was paid that back pay. That's correct. And that argument solely relates to our statute of limitations argument on the Title VII claim. So that arbitration decision was the only thing that fell within the 300-day period. So we make several arguments for why the arbitration decision can't be imputed to the agency for purposes of Title VII. And one of them is what Your Honor just mentioned, the fact that the arbitrator actually reduced the penalty that DPS had imposed on her. So DPS had imposed an unpaid suspension, and she had served that unpaid suspension, but all of that occurred outside the 300-day window. And then the arbitrator partially upheld the suspension, but only as to five days, so ended up giving her back pay. So within the 300-day period, the only incident that occurred was her receipt of back pay, in essence. She wasn't docked any further pay within the 300-day period. But I think the more important point is that that decision was issued by a third party, and therefore can't be imputed to DPS, which is a separate state agency. And finally, I'd just like to emphasize that the District Court properly dismissed the claims against four of the five individual defendants for failure to properly serve them, even after she was given a second opportunity to do so. They submitted affidavits saying they were not served either at their home or at their place of business at DPS. She effectively tried to serve them by sending the papers to a DPS attorney's home address, but there's no evidence or allegation that that attorney was an agent for service of process for the individual defendants. And therefore, the District Court correctly found that it had no jurisdiction over those defendants. Unless the Court has any further questions, we would defer to finance. Thank you. Thank you, counsel. Thank you both for your time.